```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                       DEL RIO DIVISION

3

4   UNITED STATES OF AMERICA,        *  No. DR-20-CR-1357-2
                                     *
5         Plaintiff,                 *
                                     *
6   v.                               *  MAY 23, 2023
                                     *
7   JIMMIE TROY PALMER, III          *
                                     *
8         Defendant.                 *  DEL RIO, TEXAS

9   ------------------------------------------------------------

10                 TRANSCRIPT OF SENTENCING

11           BEFORE THE HONORABLE ALIA MOSES

12       CHIEF UNITED STATES DISTRICT JUDGE
    ------------------------------------------------------------
13

14                 A P P E A R A N C E S

15

      For the Government:      UNITED STATES ATTORNEY'S OFFICE
16                             BY:  MR. REX BEASLEY
                               Assistant U.S. Attorney
17                             111 E. Broadway, Suite 300
                               Del Rio, Texas  78840
18

19

      For the Defense:         LAW OFFICES OF SAPP & STURGILL, PLLC
20                             BY:  MR. K. MICHAEL STURGILL
                               1100 Northwest Loop 410, Suite 700
21                             San Antonio, Texas  78213

22

23

24  Proceedings recorded by mechanical stenography.  Transcript
    produced by Computer-Aided transcription.
25
```

**NOTE: BENCH CONFERENCES WERE HELD IN THIS MATTER. BENCH CONFERENCES ARE CONFIDENTIAL AND NOT AVAILABLE TO THE PUBLIC.)**

(11:17:54 A.M., START TIME)

THE COURT: DR-20-CR-1357, the United States of America versus Jimmie Troy Palmer, III, Defendant Number Two.

AUSA BEASLEY: Rex Beasley for the United States.

MR. STURGILL: Mike Sturgill for the defendant, Your Honor.

PROBATION: Your Honor, may I approach?

THE COURT: Uh-huh. Sure.

MR. STURGILL: May I approach?

THE COURT: No, just let me let probation -- yeah, you may approach your client. Uh-huh.

(BENCH CONFERENCE WITH PROBATION)

THE COURT: Okay. Mr. Palmer, let me have you raise your right hand.

**JIMMIE TROY PALMER, III,**

having first been duly sworn, testified to the following:

THE COURT: Mr. Palmer, have you had the opportunity to review the presentence report prepared in your case?

DEFENDANT PALMER: Yes, ma'am.

THE COURT: And did you have sufficient time to fully

discuss the contents of the report with your attorney?

DEFENDANT PALMER:  Yes, ma'am.

THE COURT:  Mr. -- let's see, we've got Mr. Sturgill.

MR. STURGILL:  Yes, Your Honor.

THE COURT:  That's your name, right?

MR. STURGILL:  Yes, ma'am.

THE COURT:  Okay.  Did you have sufficient time to fully review the presentence report with your client?

MR. STURGILL:  Yes, I did.

THE COURT:  And did you have sufficient -- oh, let me ask you a question.  I know Ms. Guerrero had filed some objections before; do you want to proceed with those objections?

MR. STURGILL:  Yes, we do.

THE COURT:  Okay.  Go ahead with your first one.

MR. STURGILL:  With the -- the first objection, really, generally speaking to any -- any referral to any of the drugs by their improper name, we would -- we would, again, raise that objection.

THE COURT:  What do you mean the "improper name"?  It's ice.  It turned out to be ice.

MR. STURGILL:  Correct, Your Honor.  Again, I think street slang or any of that term is improper, so if -- if --

THE COURT:  Where -- where -- what paragraph are you talking about?

PROBATION:  Your Honor, it is "actual."

1        THE COURT:  It's -- yeah, it's "actual" meth.

2   That's -- it's ice, right?  Ice is "actual."

3        PROBATION:  Ice is D meth.

4        THE COURT:  Oh, I thought it was the other way around.

5   I thought "actual" is ice -- is ice.  Okay, it's "actual" --

6   it's real meth.

7        MR. STURGILL:  Yes.

8        THE COURT:  What paragraph are you talking about,

9   Mr. Sturgill?

10       MR. STURGILL:  I don't have a copy in front of me.

11          Do you have a copy by chance?

12       PROBATION:  Yes.  So we did revise the report to

13  reflect "actual" meth.

14       MR. STURGILL:  Okay.  I apologize.  I have not seen

15  the revised report, Your Honor.

16       THE COURT:  Okay.  It's dated January 21st of 2022.

17       MR. STURGILL:  I have not seen a copy of that.  I have

18  the 2021 copy.

19       THE COURT:  Okay.  Yeah, I do -- I have -- I have the

20  2022.

21       PROBATION:  Would you like a copy?

22       MR. STURGILL:  Yes, please.

23       PROBATION:  The only thing that changed was the

24  wording.

25       MR. STURGILL:  The wording.

1          THE COURT:  Okay.  Now, I'm looking at Paragraph 35.

2  It still refers to "ice."

3          PROBATION:  For the amended one, Your Honor?

4          THE COURT:  Uh-huh.

5          PROBATION:  Let me -- it should reflect "actual."

6          THE COURT:  And then Paragraph 36, also.  And

7  Paragraph 17.  I mean, I think originally it was talking

8  about -- Paragraph 17, that was the original finding, correct?

9          MR. STURGILL:  Correct.

10          PROBATION:  Your Honor, which copy do you have?

11          THE COURT:  I have the 2022.

12          PROBATION:  I have -- there's one for August 12, 2022.

13          THE COURT:  Huh-uh.

14          PROBATION:  No?  That one was filed in August.

15          THE COURT:  I have a packet of letters with

16  certificates.

17          PROBATION:  Yeah, the updated one --

18          THE COURT:  Ms. Green?

19          PROBATION:  -- in August has the "actual" wording.

20          THE COURT:  Okay, hold -- hold on just a second.

21          So then Mr. Sturgill needs that one.  You -- or did

22  you give him the August one?

23          PROBATION:  That's the one that I gave him now.

24          THE COURT:  You gave him the August one.  Okay.

25          So the wording got changed.  No problem.  I don't

1  have a problem with that at this point.

2          Okay.  Mr. Sturgill, what other objection do you

3  want to continue with?

4          MR. STURGILL:  I apologize.  Give me just one --

5  excuse me -- one second --

6          THE COURT:  Sure.

7          MR. STURGILL:  -- just to rereview this.

8          THE COURT:  Okay.

9     (BRIEF PAUSE)

10          THE COURT:  It's not on the system.

11          MR. STURGILL:  Your Honor, I apologize.  Do you mind

12  if we take a minute and read through this?

13          THE COURT:  Go have a seat, Mr. Palmer, so you can

14  speak to your attorney.

15          MR. STURGILL:  Thank you.

16          THE COURT:  That's fine.

17     (BRIEF PAUSE)

18          THE COURT:  Mr. Beasley, did you get a copy of the

19  August 2022 report?

20          AUSA BEASLEY:  I did not, but I have spoken with the

21  probation officer, and I --

22          THE COURT:  Okay, it didn't -- it didn't get on the

23  system.

24          PROBATION:  I -- I just -- I just emailed them and --

25          THE COURT:  Okay.  Okay.

1          AUSA BEASLEY:  I don't think there's any changes in

2    there that I need to address.

3          THE COURT:  Just -- it sounds like just the "actual"

4    meth versus "ice."

5          AUSA BEASLEY:  That's my understanding, it's the only

6    change.

7     (BRIEF PAUSE)

8          MR. STURGILL:  Your Honor, it does look --

9          THE COURT:  Yes, sir?

10         MR. STURGILL:  It has been corrected.

11         THE COURT:  Okay.  So what remaining objections?

12         MR. STURGILL:  No remaining -- excuse me.  No

13   remaining objections, Your Honor.

14         THE COURT:  Okay.  Mr. Beasley, has the government

15   reviewed the presentence report prepared in this case?

16         AUSA BEASLEY:  Yes, Your Honor.  We have no objections

17   or corrections.  The government moves for the third level of

18   acceptance.

19         THE COURT:  The Court grants the government's motion

20   and notes that the defendant did receive credit for all three

21   levels for acceptance of responsibility, the third level noted

22   in Paragraph 47.

23              Let me have the attorneys come up for a quick second

24   before I make all of my findings.

25         (11:30:35 TO 11:32:36 A.M., BENCH CONFERENCE)

1         THE COURT:  Okay.  The Court will adopt the legal and

2 factual conclusions contained within the revised presentence

3 report -- wait a minute.

4         Ms. Green?

5         Oh, this is the August 12th of 2022 report.  Now,

6 this is showing as -- as an initial report as opposed to a

7 revised one.

8         PROBATION:  Yes, Your Honor.  It was initially

9 disclosed, and then it was revised.

10         THE COURT:  No.  I have a report of December the 3rd

11 of 2021 was the original; revised January 21st of 2022.  So this

12 should be a revised report --

13         PROBATION:  Yes.

14         THE COURT:  -- of August 12th of 2022.

15         PROBATION:  To change the date to the --

16         THE COURT:  It's the third -- but it's a revised, not

17 an original.

18         PROBATION:  Right.

19         THE COURT:  Okay.

20         PROBATION:  But it should be on the other date.  Yes,

21 Your Honor, you're correct.

22         THE COURT:  Okay.  So August 12th of 2022.  Okay.

23         And will make the following findings:  I'm going to

24 make three sets of findings, Mr. Palmer.  I'm going to make the

25 statutory, the original guidelines, and then the new revised

guidelines.

There is a statutory range of imprisonment of ten years to life; that probation is not authorized; there is a term of supervised release of five years to life; there is a fine of not more than $10 million; there is no restitution, but there is a 100-dollar special assessment.

Pursuant to the policy statements of the Sentencing Reform Act, the Court finds that there is a Total Offense Level of 43, Criminal History Category of Four; there's a range of imprisonment of life; that probation is not authorized; there is a term of supervised release of five years; there is a fine range of $50,000 to $10 million; there is no restitution, but there is a 100-dollar special assessment.

Pursuant to the government's motion, there is a revised Offense Level of 41, Criminal History Category of Four; there is a range of imprisonment of 360 months to life; that probation is still not authorized; there is still a five-year term of supervised release; the fine range remains at $50,000 to $10 million; there is no restitution, but there is a 100-dollar special assessment.

And then there is forfeiture, right, Mr. Beasley, or is that still pending or not?

AUSA BEASLEY: Your Honor, I don't believe that's still pending. My notes show that that was dismissed in ECF Number 136.

1          THE COURT:  Because for him it was just the money,

2     correct?

3          AUSA BEASLEY:  That's correct, Your Honor.

4          THE COURT:  Okay.

5          MR. STURGILL:  Your Honor, I believe a truck as well.

6          DEFENDANT PALMER:  My truck, too.

7          THE COURT:  Okay, I'm looking at $4599.06 from

8     Mr. Palmer, the gun from Mr. Coplin, the gun parts from

9     Mr. Coplin.  The -- the truck was not alleged in the indictment,

10    though, as part of the forfeiture.  I think that was taken at

11    the port.  Possibly.  I'm not sure.

12         DEFENDANT PALMER:  No, ma'am.

13         THE COURT:  But that wasn't alleged in the indictment.

14    That's why I'm just looking at that part.

15         MR. STURGILL:  Okay.  Understood.

16         THE COURT:  Okay.  All right, Mr. Palmer, at this time

17    you have the opportunity to say whatever you'd like.

18         DEFENDANT PALMER:  May I pull my mask down?

19         THE COURT:  Sure.  Uh-huh.

20         DEFENDANT PALMER:  Your Honor, it was wrong of me to

21    try to blame anyone other than myself.  I -- I made the decision

22    that I made and -- I'm sorry.  I was -- I was trying to figure

23    out all kinds of things to say and I'm --

24         THE COURT:  That's fine.  Take your time.

25         DEFENDANT PALMER:  Your Honor, I got in a lot -- I got

in some trouble when I was younger.  And the most disappointing

thing about all this is that I had changed my life.  You know, I

-- I excelled in a career, had custody of my kids, I worked hard

for everything I had.  I just had fallen on hard times during

the pandemic and I made an ignorant decision, and this

decision's cost me everything.

Your Honor, I -- I'm not a drug dealer.  Obviously

I'm not even a good mule.

THE COURT:  Well, usually that's -- you're not a

street-level drug dealer, Mr. Palmer, but you're a --

technically, a drug dealer if you're possessing with intent to

deliver.

DEFENDANT PALMER:  Well, that's what I'm saying.  Like

I had no business even involving myself.  I've never done

anything like this before.  Like I said, I just fell on hard

times and I made a -- I made an ignorant decis -- I made -- I

opted for an easy way out, and I knew better because

nothing comes -- nothing good comes from easy.

And, Your Honor, I raised my kids.  I've never been

away from them this long before.

Before you pass down your sentence, something I

plead with you to please take into consideration, that I -- I'm

just -- I do work hard for everything I've ever had.  I mean,

this is just one decision that I made and it was -- it was the

worst one.

1    THE COURT:  But it wasn't one decision, Mr. Palmer.
2  It was a course of decisions over a period of time; was it not?
3    DEFENDANT PALMER:  I mean --
4    THE COURT:  I mean, the -- the first time was
5  July 31st of 2020?  Was that the first time that you were
6  involved in all of this?
7    DEFENDANT PALMER:  I've never tried to pass drugs over
8  the border.
9    THE COURT:  I'm sorry?
10    DEFENDANT PALMER:  I never tried to pass drugs over
11  the border.
12    THE COURT:  No, but people passed drugs, and you were
13  part of that conspiracy.  You were part of that agreement.
14  "Conspiracy" is a fancy word for "agreement."
15    DEFENDANT PALMER:  Yeah, that's the only time I've
16  ever done anything like that.
17    THE COURT:  That was the only time?
18    DEFENDANT PALMER:  Yes, that's the only time I've ever
19  done anything like that.
20    THE COURT:  Okay.  What else would you --
21    DEFENDANT PALMER:  And like --
22    THE COURT:  Go ahead.
23    DEFENDANT PALMER:  What I'm saying is, I still got --
24  I still have many things that I -- I really wish I could be
25  there for.  You know, like their first car, prom, graduation.

1         I'm hoping to get out of here with some youth left

2 in me to still be a father and not a grandfather.

3         I understand that's what I did, and I -- and I

4 accept my consequences.  I know there's consequences coming, and

5 I know I'm not going home tomorrow.

6         THE COURT:  So here's my question.  After all of your

7 experience in the criminal justice system, okay -- because

8 you've got some convictions that didn't count, and that's fine.

9 After all of that, when you were taken away from your son to a

10 certain extent, and not -- not for long periods of time.  In

11 fact, you got pretty much probation all the way around -- why

12 didn't you think about the consequences of what could happen if

13 you got caught with this?

14         DEFENDANT PALMER:  To be honest, Your Honor, I never

15 in a million years could have thought that this much time could

16 be taken from the --

17         THE COURT:  Why wouldn't you think that?  It's been in

18 the news all over the place, Mr. Palmer, about --

19         DEFENDANT PALMER:  I don't know.

20         THE COURT:  -- how bad methamphetamine is.

21         DEFENDANT PALMER:  Well, it wasn't -- I just -- I

22 didn't know that life, 25-plus years could -- I -- I just

23 didn't -- I didn't know that that was the -- I didn't even know

24 they could do that.  I had -- I had no clue that they -- that

25 this much time would be taken.

1    THE COURT:  So why didn't you look into that before

2    you came down with this?

3    DEFENDANT PALMER:  I didn't think.

4    THE COURT:  Well, that's the deal.  You want me to

5    give you less time be -- with your children -- because you

6    didn't think.  Listen to what you're asking me to do,

7    Mr. Palmer.

8    DEFENDANT PALMER:  Yes, ma'am.

9    THE COURT:  Ask me for something that's reasonable.

10   The fact that you didn't think about it is kind of tough for the

11   Court.  And I -- I know this is a high sentence.  You don't have

12   to convince me of that, Mr. Palmer.

13   DEFENDANT PALMER:  I'm -- I'm not trying to convince

14   you of that.  I mean, I -- I understand that.

15   THE COURT:  No, no, I'm just saying, I -- I realize

16   this is a high sentence.

17   DEFENDANT PALMER:  I'm just -- all I'm saying is that

18   I've proven I can be a positive and productive member of

19   society.

20   THE COURT:  When?  At which point?

21   DEFENDANT PALMER:  Your Honor, I -- I was in no

22   trouble for almost -- almost a six-year period.  No speeding

23   tickets, no nothing.  I mean --

24   THE COURT:  I get it, but this was a --

25   DEFENDANT PALMER:  I held a job the entire time.

1  Like I --

2         THE COURT:  I get it, but this was a really -- it's

3  a -- it's a really big one.  And you had been using marijuana

4  since the age of nine until before you got caught in this case.

5  You had been using methamphetamine since you were 11 years old

6  until you got caught in this case.

7         DEFENDANT PALMER:  No, ma'am.  I wasn't using

8  methamphetamine for those years that I was out.

9         THE COURT:  I'm looking at Paragraph 78.

10         DEFENDANT PALMER:  I know, I'm -- I'm telling you,

11  like, I -- I was clean.  That's why I'm saying, that's why I did

12  so well because --

13         THE COURT:  But you --

14         DEFENDANT PALMER:  -- I was clean.

15         THE COURT:  -- but you were using it before this

16  arrest?

17         DEFENDANT PALMER:  Before the -- before --

18         THE COURT:  This arrest.  Before the arrest in -- in

19  this case?

20         DEFENDANT PALMER:  Yes, ma'am, I had -- I had gotten

21  back on methamphetamines.

22         THE COURT:  Okay.  So --

23         DEFENDANT PALMER:  That's what I'm saying, like,

24  that's where my life went bad again.

25         THE COURT:  I realize that.  And you probably needed

money because of that, right?  I mean --

DEFENDANT PALMER:  It was mainly because we lost our jobs.  That's why I even turned to it in the first place.

THE COURT:  And what money you had, you were spending on meth, Mr. Palmer, right?

DEFENDANT PALMER:  Yes, ma'am.

THE COURT:  Fair enough?  Is that a fair statement?

DEFENDANT PALMER:  Yes, ma'am.

THE COURT:  Okay.  As a matter of fact, I think when you got arrested, personal use amounts of drugs were found, right?

DEFENDANT PALMER:  Yes, ma'am.

THE COURT:  Just personal use, not large quantities.

So my question is:  If money is in such a tight situation, why are you spending it on drugs?

DEFENDANT PALMER:  I was being selfish, Your Honor.

THE COURT:  Okay.  So listen again to what you're telling me.  You didn't think, you were being selfish, and I've got to give you less time for that for your children's sake, that you didn't think about all that time.

Now, I'm not saying I'm going to give you a guideline-range sentence, Mr. Palmer.  I don't know where I'm going to sentence you.  But these are the things that people come into this court and they argue all the time, Let me go because I made a mistake and my family's going to pay for it.

And I understand that.  And I will take your family into
account, Mr. Palmer, but I'm going to take them into account to
the same degree that you did.

DEFENDANT PALMER:  Yes, ma'am.  I --

THE COURT:  So what else would you like to tell me?

DEFENDANT PALMER:  Yes, you're right.  I -- it's hard
for me to stand up here and ask you for something whenever I was
in the wrong completely.  And I -- I do accept full
responsibility for it.  There's not much else I can say, other
than I was wrong in every way, and all the way around.

Your Honor, is it okay if I turn to say something to
my family?

THE COURT:  You will in just a moment.  I'll let
you do that in just -- I'm going to come back to you,
Mr. Palmer.

DEFENDANT PALMER:  Yes, ma'am.

THE COURT:  Mr. Beasley?

AUSA BEASLEY:  Your Honor, the defendant's not being
honest with you about his -- his drug sales.  He's trying to
tell you that he's not a drug dealer.  And this is not his first
offense.  He didn't get caught on the first offense, apparently,
at least the one that we know about.

As reflected by Paragraph 27 of the revised
presentence investigation report, the defendant sold drugs to a
co-defendant two weeks prior to the incident that gave rise --

1    THE COURT:  Well, that's what I thought.

2    AUSA BEASLEY:  -- to this case.

3    THE COURT:  That's what I thought.

4    AUSA BEASLEY:  And, in addition to that, Your Honor --

5  I -- and I'm sorry, I don't have the copy here, the -- the

6  signed copy, but he admitted to that.  And my notes say that he

7  admitted to that in his -- his plea agreement.

8         So, for those reasons, Your Honor, and for the

9  history that's -- there's criminal history that's not calculated

10 or given any points, as well as for the -- the factors in this

11 case, the seriousness of the offense, the government asks for

12 a -- a guideline sentence, followed by five years of supervised

13 release.

14    THE COURT:  Mr. Sturgill -- and I'm going to ask you

15 as opposed to your client, and he may address it if he'd like to

16 in just a moment -- but he's talking about raising his children,

17 but I'm showing that he owes child support for those children.

18 How did he raise them?

19    MR. STURGILL:  Judge, he -- he's got one child from a

20 previous relationship.

21    THE COURT:  Right.  That's the one in Colorado.

22    MR. STURGILL:  Correct.

23    THE COURT:  And then I'm showing in Paragraph 72, the

24 other two children -- he has a good relationship and

25 communication with the children.  I get that.  He has child

support obligations for those children.  I'm not sure about the monetary amount, and we were waiting to find out what the child support was.

MR. STURGILL:  Your Honor, he does not, but prior to his being arrested, he had custody -- excuse me -- lived in that relationship with -- with his spouse at the time with those children.

DEFENDANT PALMER:  I've been with the same woman --

THE COURT:  Okay, hold -- hold on just a second.

Say that again, Mr. Sturgill.

MR. STURGILL:  So, the -- the two younger children --

THE COURT:  Uh-huh.

MR. STURGILL:  -- prior to his arrest, they lived with him and their -- their mother.  There's no child support up until that time.  If she's filed for it, the -- the -- since then --

THE COURT:  All I'm -- all I'm going by is what he told probation.  Okay?

MR. STURGILL:  She -- she has filed since, Your Honor --

THE COURT:  Okay.

MR. STURGILL:  -- and that's why he's not familiar --

DEFENDANT PALMER:  It was while I was --

THE COURT:  Okay, hold -- hold on.  Hold on.  Let me just -- let me get on the record what I'm relying on, that way

1  you can tell me how I need to correct it.

2            I'm showing in Paragraph 72 that he told

3  probation -- because there wouldn't be any other way for us to

4  know about it, Mr. Palmer, until you told us -- that you did not

5  have any communications with the mother; that you had child

6  support obligations for your children; however, you weren't sure

7  of the amount.  And so we made an inquiry and we were waiting

8  for that information.

9            Then in Paragraph 73, you indicated that prior to

10 this offense you lived with her and the children.

11           So I'm not really sure how you didn't have

12 communications with her in Paragraph 72, but you were living

13 with her.  So I'm trying to reconcile that.

14           Tell your attorney.  I'm going to come back to you

15 in just a moment, Mr. Palmer.

16   (BRIEF PAUSE)

17       MR. STURGILL:  So, Your Honor, up until he was

18 arrested, he has that -- again, they were living together, had

19 that communication, no financial support, no obligation.

20       THE COURT:  Okay, so that was what he meant in

21 Paragraph 72, that he did not communicate with her, it was since

22 the arrest?

23       MR. STURGILL:  Correct.

24       THE COURT:  Okay.  All right.  Okay.

25           Go ahead, Mr. Sturgill.

1     MR. STURGILL:  Yes, Your Honor.  Again, I -- I -- my

2  client has -- has told you that he does understand that there's

3  severe consequences that come with this.

4           Some other things that I would ask the Court to

5  consider, first and foremost, is the fact that he has entered

6  into a plea deal on Count Three, and that was the original

7  agreement.  So it did come with a recommendation of ten years to

8  life, a 10,000-dollar fine, and he pled guilty to that.

9     THE COURT:  Uh-huh.

10    MR. STURGILL:  As well, I'd ask the Court to take into

11 considerate -- into consideration his mental status.  As the

12 Court's aware, he did have a suicide attempt.

13    THE COURT:  And he's competent, Mr. Palmer [sic].

14    MR. STURGILL:  I understand.  But that -- I believe

15 that also goes to show his mental capacity.

16    THE COURT:  His mental capacity for what?

17    MR. STURGILL:  As far as being a -- a leader or an

18 organizer in this crime, he does not -- he does not have that

19 mental capacity.

20    THE COURT:  Well, that -- that report doesn't show

21 that, Mr. Sturgill.  I'm not -- I'm not relying on that report

22 to find out what his role in this offense was.  And --

23 especially since no one objected to the leadership role.

24    MR. STURGILL:  Again, Your Honor, I think that showing

25 that his mental illness, he -- he requires additional treatment.

1    THE COURT:  No, Mr. Sturgill.  You're not going to get

2    the government's motion and claim he was -- didn't know what was

3    going on.  Because if he's got that kind of information to get

4    that, you can't now minimize it.  You can't have it both ways.

5         I've got the report.  I do have that.

6    MR. STURGILL:  Okay.  Additionally, Your Honor, I know

7    that the Court looks at the potential for what happens after

8    release from prison.  As he stated, he did have -- he does have

9    heavy machinery operation skills and he can -- he can sustain a

10   life after prison for that.

11        His father is here, who -- there's mention about

12   the -- the previous relationship there.  His father has put his

13   home up for sale to be able to move closer.  His father is a

14   retired law enforcement officer as well.  He does take -- want

15   to take responsibility and help my client get through this and

16   get better.  Again, part of that being getting additional

17   treatment for -- for substance abuse issues as well as for his

18   mental health.  And so he's here in the courtroom today, as well

19   as his mother and sister.

20        There's additional active-duty officers who are

21   willing to help him, as well as his -- his uncle.  Significant

22   people in his family are willing to support him and help him get

23   through --

24   THE COURT:  So what is he doing in front of me with

25   this very serious case if there's that much support,

1  Mr. Sturgill?

2          MR. STURGILL:  I think going back to the relation --

3  there wasn't that support in that relationship prior to this.

4  Again, his father and his mother, they separated when he was a

5  child.

6          THE COURT:  Uh-huh.  I -- I did see that in the

7  report.

8          MR. STURGILL:  He -- he has not had a -- a long

9  relationship with him.  As a result of that, his father moved

10 farther away.  And so his father is stepping in now and really

11 wants to assist him and be able to help him get through this.

12          And his mother's been there.  She's supported him

13 as -- as best she could.  His sister's here as well.

14          THE COURT:  And so I'm looking at Page 17 of the

15 report.  That doesn't strike me as being a mental disorder.

16 It's stimulant use disorder, amphetamine type severe in

17 controlled environment, narc -- histrionic and narcissistic

18 personality traits.  How is that a mental disorder?

19          MR. STURGILL:  I think all of those things need

20 treatment, Your Honor, is what it boils down to, so he can

21 get --

22          THE COURT:  It means growing up, Mr. Sturgill.

23          MR. STURGILL:  Understood.

24          THE COURT:  So please tell me how the stimulant use

25 disorder needs treatment that he hasn't had a chance to get

1    before.  How did he not have a chance for that before?

2             MR. STURGILL:  Again, I think going back to the

3    situation that as -- as he -- as he stated, and not to make an

4    excuse, Your Honor, is what it boils down to, is -- is what it

5    sounds like, but understood that he --

6             THE COURT:  Uh-huh.

7             MR. STURGILL:  -- he was in a bad situation and made

8    poor choices, is what it boils down to.

9             THE COURT:  Okay.  And so, Mr. Palmer, what else would

10   you like to say?

11            DEFENDANT PALMER:  You're right.  I did need growing

12   up.

13            THE COURT:  Uh-huh.  And so now we have --

14            DEFENDANT PALMER:  Even though --

15            THE COURT:  -- your attention, right, Mr. Palmer?

16            DEFENDANT PALMER:  Even though I thought I was doing

17   really well and this and that -- I mean, and I may have been --

18            THE COURT:  Uh-huh.

19            DEFENDANT PALMER:  -- I still had many -- many issues

20   that I didn't -- I didn't -- I didn't step forward and take care

21   of what I should have.

22            THE COURT:  So why?

23            DEFENDANT PALMER:  Ma'am?

24            THE COURT:  Why?

25            DEFENDANT PALMER:  Ignorance on my behalf, I believe.

1        THE COURT: Ignorance how?

2        DEFENDANT PALMER: You said why -- why didn't I take

3 care of them?

4        THE COURT: I said -- and I'm asking what kind of

5 ignorance.

6        You're a very smart young man, you're well spoken.

7        DEFENDANT PALMER: I just -- it's always been hard for

8 me to look at issues that I have, and it's always been easier

9 for me to either blame or deflect instead of stepping up and

10 taking responsibility like I always should have. I know that I

11 should have been on medication a long time, I just don't --

12 didn't like it, didn't feel like I needed it.

13        Like, I said, Your Honor, there's -- you're

14 absolutely correct, I did need growing up. And I -- I'm still

15 working on it today.

16        THE COURT: And you will until you're 60/70, probably,

17 Mr. Palmer. That's just the reality of life. I don't know that

18 we ever grow up totally.

19        You had a very good job. You were making good money

20 up until July of 2020?

21        DEFENDANT PALMER: Yes, ma'am. That's -- that -- I

22 wasn't trying to mislead you or lie to you about the drug

23 dealing, stuff like that. That's why I'm saying, all that was

24 in a two-week time span. It was -- something was presented --

25        THE COURT: But you're telling me that you got

1  involved with this because of COVID and the loss of work, and

2  then I look at your report in Paragraph 81, you were working

3  until July 17th of 2020 --

4             DEFENDANT PALMER:  Well, that --

5             THE COURT:  -- earning good money.

6             DEFENDANT PALMER:  But that's what I'm saying, like --

7             THE COURT:  That's two weeks before your arrest,

8  right?

9             DEFENDANT PALMER:  I'm -- what I'm saying is, is it

10 was -- we had significant hour cut -- you know what, I'm not

11 even going to make an excuse.  I started --

12            THE COURT:  You don't have to.

13            DEFENDANT PALMER:  I started -- I started -- I started

14 messing with somebody I shouldn't have, which led me to get back

15 on drugs, and I spent all of our money.  We didn't have anything

16 in savings, like -- I was already -- I'm already young and I --

17 I like -- I like to spoil my kids, so I was out -- I never was

18 very good with money.  I'll be honest.  I'll -- I had a big

19 house.  You know, I mean, I made sure my kids are in dance, in

20 ball, and whatever else they ever wanted, you know, because I

21 didn't have those things.

22            So -- I've never been responsible with money, so

23 before I knew it, everything was spiraling so far out of

24 control.  And that's when -- up until the two-week time period

25 when somebody came to me and they presented this opportunity and

I thought, well, it's -- it's something quick and easy that I could put -- at least catch up for the two months I was behind on my mortgage, and put some food in my fridge until I can get another job.  And it just -- it never works out that way.  Because, like I said, I opted for something -- for the easiest way out, and easy never works.

        THE COURT:  Okay.

        DEFENDANT PALMER:  But I knew better.

        THE COURT:  What else do you want to tell me?

        DEFENDANT PALMER:  I accept -- I accept responsibility, Your Honor.  That's all I can say.

        THE COURT:  Okay.  Probation, let me see you for just a second.

    (BENCH CONFERENCE WITH PROBATION)

        THE COURT:  Okay.  Mr. Palmer --

        DEFENDANT PALMER:  Yes, ma'am.

        THE COURT:  -- in assessing a sentence in this case, I'm -- I'm taking into account the advisory guidelines, as well as the policy statements of those guidelines, together with other sentencing factors such as the nature and circumstances of the offense, the seriousness of the offense, the history and characteristics of the defendant, the need to promote respect for the law and to provide just punishment for the offense, the need to deter future criminal conduct and to protect the public.

            The Court also takes into account the allocution of

1  the parties, as well as the factual information contained within

2  the presentence report.

3          You've been minimizing today.  A lot.  Now, you put

4  this thing together with Mr. Carr, who is still in state prison.

5  There are a lot of phone calls and there's a lot of -- there's a

6  lot of information.  You met Mr. Carr while you were in custody.

7  And a search of the phone -- you had several phone calls between

8  him and you, and he recruited you to put this team together and

9  get this done.  So this wasn't just you were just down here to

10 be a mule and just backup for somebody.  You put this together

11 with Mr. Carr.

12         So, you know, all of the information that I'm

13 reading is, basically, a minimization of what was really going

14 on here.  I've been doing this a long time, Mr. Palmer.  I don't

15 fall for things like that.  Especially after having looked at

16 the letter from some phsychol -- psychiatrist, psychologist,

17 counselor, Sarin.  That is the worst piece of literature that

18 I've ever read.  I'm not going to be dictated to by this lady on

19 the guidelines and what President Biden made clear in his

20 campaign.

21         DEFENDANT PALMER:  I don't know --

22         THE COURT:  I don't know what y'all were trying to do

23 with that letter, but it wasn't persuasive.

24         DEFENDANT PALMER:  I don't even know who that is.

25         THE COURT:  Well, it's in your packet of letters.

Somebody who claims to have met you while in custody, was -- and

was counseling you as well.  So, either she's lying -- but she

wrote a letter to your -- to your attorney claiming that you

were a current client.  So either somebody got a letter to your

attorney which was a big lie -- were you a client of this

doctor?

DEFENDANT PALMER:  I don't know who Sarin is.

THE COURT:  Rakesh Sarin?

DEFENDANT PALMER:  I don't know who that is, Your

Honor.

THE COURT:  Well, then, your family submitted letters

that were untrue.

DEFENDANT PALMER:  The only thing I can think of is

that it's a -- it was an inmate in Fort Worth.

THE COURT:  She's not -- well, it's --

DEFENDANT PALMER:  I don't think --

THE COURT:  -- she claims -- she claims you are her

client and she's a counselor.

DEFENDANT PALMER:  Yeah, I don't think it's a "she."

I think it's a --

THE COURT:  Or "he."

DEFENDANT PALMER:  It was a "he."  Yes, ma'am.  I

think it was -- it was a "he."

THE COURT:  Okay.  So an inmate can't be a counselor

while in custody --

1    DEFENDANT PALMER:  Yes, ma'am.

2    THE COURT:  -- Mr. Palmer.  So you would know him.

3 You're telling me you don't know this person.

4    DEFENDANT PALMER:  Well, I didn't -- I didn't know --

5 when you said "she" I didn't understand.  The only person I can

6 think of with that kind of name would be the -- the gentleman

7 who was Indian.

8    THE COURT:  So, you're a current client who's been

9 assigned -- he's been assigned to you regarding your legal case?

10    DEFENDANT PALMER:  I don't -- it was just somebody I

11 was talking -- somebody who was, like, helping me.  Like

12 counseling me while I was there.

13    THE COURT:  So it's another inmate?

14    DEFENDANT PALMER:  Yes, ma'am.

15    THE COURT:  You think I'm going to listen to another

16 inmate?

17    DEFENDANT PALMER:  Well, I -- I didn't know.

18    THE COURT:  You really think that?  If he -- if he

19 knew what he was doing, would he be an inmate sitting with you

20 in custody, Mr. Palmer?  Does that make any sense to you?

21    DEFENDANT PALMER:  No, ma'am, it doesn't.

22    THE COURT:  So why would you think that I would be

23 persuaded by him?

24    DEFENDANT PALMER:  I -- I don't know, Your Honor.

25    THE COURT:  I -- I don't need to learn the guidelines

1  from him.

2          DEFENDANT PALMER:  Yes, ma'am.

3          THE COURT:  So that's the part that sometimes rubs me

4  the wrong way, Mr. Palmer; that y'all think that I'm so

5  stupid --

6          DEFENDANT PALMER:  Well, it wasn't --

7          THE COURT:  -- that you think I'm so stupid that I

8  don't know what I'm doing and I need this kind of information to

9  persuade me.  That's -- that's actually, probably, pretty

10 narcissistic of people to think that I'm going to fall for this

11 kind of stuff because I'm that stupid.  I became a district

12 judge just because I happen to be, what, a Hispanic female; is

13 that what everybody thinks?

14         DEFENDANT PALMER:  No, ma'am.  I don't.

15         THE COURT:  So why would you think that I wouldn't

16 know what I'm doing after over 20 years of being a district

17 judge?

18         DEFENDANT PALMER:  I don't -- I didn't read that

19 letter.  I don't -- I didn't even know it -- all I know is that

20 they said they were writing a letter of recommendation.

21         THE COURT:  I get it.  But the --

22         DEFENDANT PALMER:  That's it.

23         THE COURT:  I -- I get it.

24         DEFENDANT PALMER:  Like, I -- I didn't -- I don't

25 know, I thought -- I just anything -- any -- any -- if somebody

1  wanted to write a -- like, a recommendation for me, anything

2  would help.  That's all it was.

3          THE COURT:  I get it.  But, Mr. Palmer, but that's the

4  point.

5          DEFENDANT PALMER:  I -- I definitely wasn't trying to

6  make you --

7          THE COURT:  You need to -- you need to know what they

8  write on your behalf because it's going to affect you.

9          DEFENDANT PALMER:  But I definitely didn't mean to rub

10  you the wrong way.

11          THE COURT:  Well, the bottom line is, it's all about

12  minimization.  That's all -- that's all I'm hearing.  It's all

13  about minimization.  Everything I've read, it's all about

14  minimization.  And everything that I'm hearing today is really

15  kind of contrary to what probation was -- the information

16  probation was getting.  Prior to your arrest, you were making

17  $9,100 a month, according to you.  And you're telling me that

18  you weren't making that prior to your arrest.  You're telling me

19  that within two weeks everything came crashing down around your

20  head.

21          DEFENDANT PALMER:  Well, that's why I was telling you,

22  like, I -- it wasn't that.  I -- I admitted to you that I had

23  started hanging around with somebody I shouldn't have been --

24          THE COURT:  Okay, so who --

25          DEFENDANT PALMER:  -- and when I got back on drugs.

1 And before I --

2       THE COURT: So how long had you been on drugs? When

3 you started hanging around with this person, how long had you --

4 did you get back on -- how long would that have been?

5       DEFENDANT PALMER: I started doing drugs -- it was

6 about a -- it was -- it was about two months before the --

7 the -- all this had happened.

8       THE COURT: Yeah, there's minimization again.

9       DEFENDANT PALMER: I mean, that's -- because, like I

10 said, I hadn't been doing drugs all -- the whole -- that

11 while -- while I was out, all -- all the way up until I started

12 messing with that person. And that -- and I'm not going to sit

13 here and give you excuses, it's just --

14       THE COURT: Well, according to what you told

15 probation, you started using marijuana at the age of nine; you

16 consumed it daily until the date of your arrest --

17       DEFENDANT PALMER: Well, yes, ma'am. I --

18       THE COURT: -- in this case. Right? Marijuana is a

19 drug and it's illegal under federal law, Mr. Palmer.

20       DEFENDANT PALMER: Yes, ma'am.

21       THE COURT: Okay. And that you had started using --

22 the first time you used methamphetamine intravenously was at the

23 age of 11, and that -- was a daily meth user until the date of

24 your arrest. That's the information you gave probation. So

25 which part of that is not correct?

1   DEFENDANT PALMER:  It was not -- it's not correct all

2   the way up to the day of my arrest.  I started using meth --

3   THE COURT:  Which part?

4   DEFENDANT PALMER:  I -- I -- in 2000 and -- when I got

5   out of TDC in 2000 --

6   THE COURT:  Which -- which one?

7   DEFENDANT PALMER:  I've only been to TDC once, Your

8   Honor.

9   THE COURT:  Okay.  Let me -- let -- so it's your

10  last -- your last case or...

11  DEFENDANT PALMER:  Yes, ma'am, my last case, the --

12  THE COURT:  In 2011.

13  DEFENDANT PALMER:  -- unlawful carrying of a firearm.

14  THE COURT:  So when you got out in 2014 --

15  DEFENDANT PALMER:  Yes, ma'am.  I -- and I didn't do

16  methamphetamines up until before this incident.

17  THE COURT:  So how long before this incident?

18  DEFENDANT PALMER:  Like I said, two months before

19  this.

20  THE COURT:  So you used so much methamphetamine in

21  those two months that you were behind on your house payment for

22  two -- for how long?

23  DEFENDANT PALMER:  No, that's why I told you earlier,

24  I -- I spent a lot of money already.  And then when I was doing

25  that -- I had another girlfriend is what it was.

THE COURT:  Hmmm.

DEFENDANT PALMER:  I was trying to support her as well as my family.  And like I said, I -- I already -- I already was never good with money.

THE COURT:  Okay.  So you didn't admit to the girlfriend to probation.  Where do I need to put her in your background?  Let's say Paragraph 72.5.

Who's the girlfriend?

DEFENDANT PALMER:  It was just -- it was just a girl.

THE COURT:  Who's the girlfriend, Mr. Palmer?

DEFENDANT PALMER:  Jessica Gunderson.

THE COURT:  I'm sorry?

DEFENDANT PALMER:  Jessica Gunderson.

THE COURT:  Okay.  And when did -- when did you begin that relationship?

DEFENDANT PALMER:  About two -- about -- about two and a half months prior to that.

THE COURT:  Prior to your arrest?

DEFENDANT PALMER:  Yes, ma'am.

THE COURT:  So roughly about June of 2020?

DEFENDANT PALMER:  Yes, ma'am.

THE COURT:  Okay.  So it'd only been about a two-month relationship.  Okay.  Any contact with her since?

DEFENDANT PALMER:  No, ma'am.

THE COURT:  Okay.  Those are the kind of things,

1  Mr. Palmer, you can't keep from my probation office.  When they

2  ask you about relationships, it means all of them.

3          DEFENDANT PALMER:  I was more embarrassed about it.

4          THE COURT:  I understand that, Mr. Palmer.

5          DEFENDANT PALMER:  I mean, it was --

6          THE COURT:  But you're asking me today to give you a

7  lesser sentence while you're withholding information to my --

8  those probation officers work for me.  They don't work for

9  Mr. Beasley.

10          DEFENDANT PALMER:  I know, and I didn't mean to

11  withhold.  I just -- like I said --

12          THE COURT:  Well, but you did.

13          DEFENDANT PALMER:  -- it was very embarrassing.

14          THE COURT:  And I -- I get it.  I under -- I very much

15  understand that, Mr. Palmer.  You -- you don't have to convince

16  me of that.  I would know that.  Okay?

17          DEFENDANT PALMER:  Yes, ma'am.

18          THE COURT:  But the problem is you're standing here

19  today, wanting me to take pity on you and to look at you in an

20  honest way and this is what I'm getting.  You think -- do you

21  understand how it looks?

22          DEFENDANT PALMER:  Yes, ma'am, I do.

23          THE COURT:  And I did get a packet of letters that had

24  gone to Ms. Guerrero.  I don't know if you've had a chance to

25  see them, Mr. Sturgill.

1          MR. STURGILL:  I have not, Your Honor.

2          THE COURT:  Do you need to see them?  One was from

3    the -- from his wife, one from his mom, one from a friend, I

4    think one from a -- the boss at the place where you worked.

5          DEFENDANT PALMER:  Yes, ma'am.

6          THE COURT:  Another one from an educator.

7          MR. STURGILL:  Your Honor, I have seen some of those.

8    His -- his mom forwarded some to me.  Not the official stamped

9    copy of the filings, but --

10          THE COURT:  Okay, do -- do you need to see any of

11    them, just to go through them and see if you have a copy of

12    them?

13          MR. STURGILL:  I would like to take a look, Your

14    Honor, yes, ma'am.

15      (BRIEF PAUSE)

16          MR. STURGILL:  Thank you, Your Honor.

17          THE COURT:  Okay.  Are those the ones you have?

18          MR. STURGILL:  Yes.

19          THE COURT:  Okay.  Let me -- the guidelines are not

20    adequate.  One is the traditional departure that I've gotten.

21    And I'm actually going to go even -- go a little below that as

22    well.  And that's taking into account the sentencing guidelines,

23    the policy statements, the advisory -- the -- the sentencing

24    factors, what y'all have said, the information in the

25    presentence report, the legal and factual conclusions, the

government's advisory, the letters that I've received.  Taking

everything into account -- I'm also taking into account the

report that I received from the Bureau of Prisons as well.

It is the order and the judgment of the Court that

the defendant, Jimmie Troy Palmer, III, is hereby committed to

the custody of the Bureau of Prisons to be imprisoned for a term

of 300 months, with credit for the time you have served in

custody since August the 1st of 2020.

That upon release from imprisonment, you will be

placed on a term of supervised release of five years.  That

while on supervised release, you shall comply with all the

conditions of supervision adopted by the Court in November of

2016.

Now, Mr. Palmer, I saw you shake your head "no."

What part do you not agree with?

DEFENDANT PALMER:  I'm not -- I --

THE COURT:  I mean, that's okay.  You can tell me.

It's not going to change your --

DEFENDANT PALMER:  No, ma'am. I'm not trying to offend

you.  I'm not --

THE COURT:  No, you're not.  You won't offend me,

Mr. Palmer.

DEFENDANT PALMER:  I -- I just --

THE COURT:  You're not going to offend me.

DEFENDANT PALMER:  I just --

1    THE COURT:  It's a long time, isn't it?

2    DEFENDANT PALMER:  Eighty-five percent is a long time.

3 Like what --

4    THE COURT:  Uh-huh.

5    DEFENDANT PALMER:  I just don't know what I'm going to

6 do.  Like I -- I raised my kids.  Like, what am I going to do,

7 come home to be a grandfather?  Like, come home in my 50s and

8 then do manual labor for the next ten years until I can't do

9 nothing no more.

10    THE COURT:  Uh-huh.

11    DEFENDANT PALMER:  Like, I just don't --

12    THE COURT:  Well, Mr. Palmer, but that's the point of

13 these -- the federal cases and federal guidelines is that no one

14 is taking this stuff seriously because -- and this is not your

15 fault at all.  If some state judge had taken some of your

16 background more seriously and given you a better lesson, you

17 wouldn't be before me today.  You wouldn't.  But you got away

18 with three days, and probation, and probation, and deferred, and

19 three days in prison until your very last case -- which I think

20 at first it even started as a deferred adjudication and got

21 revoked.  If somebody had taken this seriously, they might have

22 gotten your attention at an earlier time, you wouldn't be facing

23 this.

24    Now, I'll be honest, regardless of what had been

25 said in this court, this is not a life sentence type of case.  I

1    can tell you that.  I -- I never saw this as a life sentence for
2    you.

3              DEFENDANT PALMER:  Okay.

4              THE COURT:  So it wasn't questioned about that.  Even
5    360.  I'm not seeing it as a 30-year case for you.  This is not
6    a 30-year case for you.  However, it's a significant case,
7    Mr. Palmer.  And the fact that you didn't take it seriously or
8    you didn't think about how serious it could be doesn't change
9    the fact that it's a serious case.

10             And, no, I'm not offended by what you've said,
11   Mr. Palmer.  I understand it.

12             That while on supervised release, you shall comply
13   with all the conditions of supervision adopted by the Court in
14   November of 2016.

15             Your special conditions are that you shall abstain
16   from the use of alcohol and/or all other intoxicants during the
17   term of supervision; that you shall participate in a substance
18   abuse treatment program and follow the rules and regulations of
19   the program; that the program shall include testing and
20   examination to determine if you have reverted to the use of
21   drugs or alcohol.  Your probation officer shall supervise your
22   participation in the program.  They'll let the Court know how
23   you're doing, but they'll give you your day-to-day instructions.
24   That you shall pay for the cost of the treatment based on your
25   ability to pay.

1          That you shall not use or possess any controlled

2     substances without a valid prescription.  That if you have a

3     valid prescription, you must disclose your prescription

4     information to your probation officer and follow the

5     instructions on the prescription.

6          Mr. Palmer, I'm -- as of right now, those state

7     prescriptions for marijuana are not valid under federal law, so

8     don't rely on those.  Do you understand?

9          DEFENDANT PALMER:  Yes, ma'am.

10         THE COURT:  Frankly, Mr. Palmer, it's that using of

11    pot at the age of nine that probably has you here.

12         That you shall submit to substance abuse testing to

13    determine if you have used a prohibited substance; that you

14    shall not attempt to obstruct or tamper with the testing

15    methods, and you shall pay for the cost of testing based on your

16    ability to pay; that you shall not knowingly purchase, possess,

17    distribute, administer or otherwise use any psychoactive

18    substances such as synthetic marijuana, bath salts, et cetera,

19    that impair a person's physical functioning, whether or not

20    intended for human consumption.

21         That you shall participate in a mental health

22    treatment program and follow the rules and regulations of that

23    program; that your probation officer, in consultation with your

24    treatment provider, shall supervise your participation in the

25    program, again, let the Court know how you're doing, but give

you your day-to-day instructions; that you shall pay for the
cost of the treatment based on your ability to pay.

That you shall take all mental health medications
that are prescribed by the treating physician as prescribed.

Mr. Palmer, I'm not ordering the doctor to put you
on medications, but if they do, I'm ordering you to take them as
prescribed.  Do you understand this condition?

DEFENDANT PALMER:  Yes, ma'am.

THE COURT:  Do you have any questions about them?

DEFENDANT PALMER:  No, ma'am.

THE COURT:  Okay.  You need to speak louder for the
record, please.

DEFENDANT PALMER:  Yes, ma'am.

THE COURT:  The Court finds that there is insufficient
evidence to indicate you have the ability to pay a fine within
the guideline range, although the Court finds that you do have
the present as well as a future ability to pay a lesser fine in
the amount of $5,000.  The Court will further order that you pay
to the United States a special assessment of $100.

So as of right now, you owe $5,100.  That does not
mean you have to pay it today.  Whatever your balance is when
you're released from custody, you will pay off at the rate of no
less than --

PROBATION:  $100 a month, Your Honor.

THE COURT:  -- no less than $100 per month, with your

first payment due no earlier than 60 days from the date of
release.  Then you will pay no less than $100 every month
thereafter until your fine and special assessment are completely
paid off.  If you willfully fail to pay your fine and your
special assessment off at this rate, that can be a basis for the
revocation of your term of supervised release.  So if you start
having money problems, you need to tell the probation officer.

Do not commit a crime to get the money to pay it
off, number one; and number two, even if you don't have the
money, you continue to comply with all of the conditions of
supervision.  If money is your only issue and you tell us, we
will work with you.  Do you understand?

DEFENDANT PALMER:  Yes, ma'am.

THE COURT:  You -- within 72 hours of being released
from custody, you will report to the U.S. Probation Office in
Waco.

The Court will accept the plea agreement -- well,
let me make this other finding.  You have now been convicted of
a drug trafficking offense, and as such will be denied federal
benefits in accordance with federal law, pursuant to 21,
Section 862 little "a," the little "a" not in parentheses, for a
term of five years.

The Court will accept the plea agreement because it
is satisfied that the agreement adequately reflects the
seriousness of the actual offense conduct, and that accepting

1    the plea agreement will not undermine the statutory purpose of

2    the sentencing provisions.

3             So, Mr. Beasley, let's begin with the original

4    indictment.

5         AUSA BEASLEY:  The original indictment, Your Honor,

6    charged Mr. Palmer in Counts One, Two and Three.  He was not

7    charged in Count Four.  As to Mr. Palmer, the government moves

8    to dismiss those charges against him in the original indictment.

9         THE COURT:  And then in the super -- in the

10   superseding indictment?

11        AUSA BEASLEY:  He was charged in Counts One, Two, and

12   Three.  He was not charged in Count Four.  He pled to Count

13   Three.  As to Mr. Palmer, the government would move to dismiss

14   those charges against him in Counts Two -- One and Two of the

15   superseding indictment.

16        THE COURT:  The Court will grant the government's

17   motion and dismiss Counts One and Two of the superseding

18   indictment and all three against you of the original indictment.

19            The Court will order that the presentence

20   investigation report and all related documents be sealed and be

21   made part of the record for appellate purposes.

22            Although, Mr. Palmer, you did give up the right to

23   appeal your sentence as part of your plea agreement.

24            Do you remember that?

25        DEFENDANT PALMER:  Yes, ma'am.

1    THE COURT:  Okay, I need it louder, Mr. Palmer.

2    DEFENDANT PALMER:  Yes, ma'am.

3    THE COURT:  I'm sorry?

4    DEFENDANT PALMER:  Yes, ma'am.

5    THE COURT:  Okay.  Anything further, Mr. Beasley?

6    AUSA BEASLEY:  No, Your Honor.

7    THE COURT:  Okay, Mr. Palmer, I'm sorry, you said you

8    wanted to say something to your family.  What did you want to

9    say?

10    DEFENDANT PALMER:  Can I turn to them?

11    THE COURT:  Yeah, but you need to speak into the

12    microphone because you're still on the record.

13    DEFENDANT PALMER:  I'm sorry, Mom.  Y'all deserve

14    better than this.

15    THE COURT:  I don't know that they can hear you,

16    Mr. Palmer.  The acoustics --

17    DEFENDANT PALMER:  I'm sorry, Mom.

18    THE COURT:  These acoustics are very poor.

19    DEFENDANT PALMER:  I know that y'all deserve better

20    than this.  I'll be back.  I'll be home one day.  But I'm sorry,

21    Mom.

22    THE COURT:  Okay.  Anything further, Mr. Beasley --

23    DEFENDANT PALMER:  Can I recommend a unit?

24    THE COURT:  -- or Mr. Sturgill?

25    AUSA BEASLEY:  No, Your Honor.  Not from the

1  government.

2          THE COURT:  Okay.

3          DEFENDANT PALMER:  Can I recommend a unit?

4          MR. STURGILL:  Can we recommend a unit, Your Honor?

5          THE COURT:  You can recommend.  Sure.

6          DEFENDANT PALMER:  Oxford.

7          THE COURT:  Mississippi?  FCI --

8          DEFENDANT PALMER:  Oxford, Wisconsin.

9          THE COURT:  Okay, F --

10          DEFENDANT PALMER:  My grandparents are up there.

11          THE COURT:  FCI Oxford?

12          DEFENDANT PALMER:  Yes, ma'am.

13          THE COURT:  Okay.  I will --

14          DEFENDANT PALMER:  I'd like a chance to be able to see

15  them.

16          THE COURT:  I will make that recommendation.  I can't

17  guarantee it, but I will make that recommendation.

18          Now, I'm also -- Mr. Beasley, I do or don't need

19  the -- you said "no" on the money, correct?

20          AUSA BEASLEY:  That is correct.

21          THE COURT:  Okay.  All right.

22          Have a seat, Mr. Palmer, so you can have another

23  conversation with Mr. Sturgill.

24      (12:16:16 P.M., OFF THE RECORD)

25                          -oOo-

1                    **C E R T I F I C A T E**

2

3

4

5    U.S. DISTRICT COURT        )

6    WESTERN DISTRICT OF TEXAS )

7    DEL RIO DIVISION           )

8

9

10           I, Vickie-Lee Garza, Certified Shorthand Reporter, do

11   hereby certify that the above-styled proceedings were reported

12   by me, later reduced to typewritten form, and that the foregoing

13   pages are a true and correct transcript of the original notes to

14   the best of my ability.

15

16

17           Certified to by me this 20th day of June, 2023.

18

19

20

21                          /s/  VICKIE-LEE GARZA
                            TX CSR #9062, Expires 10/31/23
22                          P.O. Box 2276
                            Del Rio, Texas  78841
23

24

25